**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

VENUS ROBINSON,

     Plaintiff,

v.

UNIVERSITY OF COLORADO, DENVER and JERRY WARTGOW, REBECCA KANTOR, BARBARA SEIDEL and CINDY GUTIERREZ in their individual capacity,

     Defendants.

---

**VERIFIED COMPLAINT AND JURY DEMAND**

---

     Venus Robinson (hereinafter, "Ms. Robinson"), by her attorney, Jennifer C. Robinson, hereby respectfully files this Verified Complaint against Defendants University of Colorado, Denver (hereinafter "CU, Denver"), Jerry Wartgow, Rebecca Kantor, Barbara Seidel and Cindy Gutierrez, individually.  As grounds Ms. Robinson alleges as follows:

**NATURE OF ACTION**

     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), (Title IX), prohibits discrimination based on sex in education programs or activities.  All public and private educational institutions that receive any federal financial assistance must comply with this law.  Title IX protects students in all academic, educational, extracurricular, athletic, and other programs or activities of schools.  This includes prohibiting discrimination against <u>pregnant and parenting students</u>.  The Office of Civil Rights in the U.S. Department of Education is

responsible for enforcing laws prohibiting discrimination in federally assisted educational programs and has implemented regulations that govern Title IX. These regulations specifically prohibit discrimination against a student based on pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery from any of these conditions. Under Title IX, it is illegal for schools to exclude a pregnant student from participating in any part of an educational program. When a student returns to school, she must be allowed to return to the same academic and extracurricular status as before her medical leave began.

Ms. Robinson is a student at CU, Denver and alleges that CU, Denver violated Title IX by excluding her from participating in an educational program because she was pregnant and prohibiting her from returning to the same academic status upon her return from maternity leave. Moreover, when Ms. Robinson returned from maternity leave she was placed on a Level III Professional Action Plan. The purpose of the Action Plan was to help those students who were struggling with meeting the program requirements. The stated reason for putting Ms. Robinson on the Level III Action Plan was because she had stepped out of the program to have her baby. Under Level IV of the Action Plan Ms. Robinson was subject to immediate dismissal if she did not meet the Level III requirements.

Prior to going out on maternity leave Ms. Robinson was in academic good standing, maintained a 3.75 GPA and had not been told that she had any problems with meeting the program requirements. In fact, she had just 3 weeks left to complete the year long internship portion of the program. Placing Ms. Robinson on the Level III Professional Action Plan is a per se violation of Title IX. CU, Denver also discriminated against Ms. Robinson by holding her to different standards that were more stringent and harsh than the standards applied prior to her

going out on maternity leave, then terminating her from an educational program when it alleges that she failed to meet those standards.

Ms. Robinson also has claims against the individual defendants based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution and alleges that she had a property interest and liberty interest in her continued status as a student at CU, Denver that was violated when she was dismissed from the program she was enrolled in without due process of law.  Ms. Robinson has also asserted a state law claim for breach of contract against CU, Denver for its failure to provide the educational opportunities promised.  Finally, Ms. Robinson seeks declaratory relief as described more fully herein.

## JURISDICTION AND VENUE

1.      This Court is vested with jurisdiction over Ms. Robinson's claims pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution and 28 U.S.C. §§ 1331 and 1343.  This Court may exercise supplemental jurisdiction over Ms. Robinson's state law claims pursuant to 28 U.S.C. § 1367.

2.      The unlawful practices alleged herein were committed within the jurisdictional district of the United States District Court for the District of Colorado.  Venue of this action is vested in this Court pursuant to 28 U.S.C. § 1391.

3.      There are no administrative remedies that Ms. Robinson was required to exhaust prior to initiating this lawsuit.

## PARTIES

4. Plaintiff, Ms. Robinson is a resident of the state of Colorado and at all times relevant hereto was a student at CU, Denver.

5. Defendant, CU, Denver is a public research university providing educational opportunities to its students in a vast array of disciplines. CU, Denver receives federal financial assistance as that term is defined in Title IX.

6. Defendant, Jerry Wartgow ("Wartgow") is the chief academic and administrative officer of CU, Denver. He is responsible to the president for the conduct and affairs of CU Denver.

7. Defendant, Rebecca Kantor ("Kantor") is the Dean of the School of Education & Human Development at CU, Denver.

8. Defendant, Barbara Seidl ("Seidl") is the Associate Dean, Academic Programs & Undergraduate Experiences at the School of Education & Human Development at CU, Denver.

9. Defendant, Cindy Gutierrez ("Gutierrez") is the Director, Office of Partnerships at the School of Education & Human Development at CU, Denver.

## OTHER KEY PLAYERS

10. Sarah Flanders ("Flanders") is the Program Manager for the Student Teacher Residency Program at the School of Education & Human Development at CU, Denver.

11. Stephanie Chavira ("Chavira") is the Student Teacher Residency Field Coordinator for the Student Teacher Residency Program at the School of Education & Human Development at CU, Denver.

12.     Aileen Giardina ("Giardina") was Ms. Robinson's Mentor Teacher during Ms. Robinson's internship at Green Valley Elementary ("GVE") from August 15, 2014 through March 9, 2015 when she went out on maternity leave.

13.     Erin Mulcahy ("Mulcahy") was Ms. Robinson's Mentor Teacher during Ms. Robinson's internship at College View Elementary ("College View") from August 17, 2015 through September 18, 2015 when she returned from maternity leave.

## FACTUAL ALLEGATIONS

14.     The Urban Community Teacher Education Program at CU, Denver provides students who already have a bachelor's degree in a different discipline with a pathway to obtain their teaching license and become licensed teachers in the State of Colorado.  Students in the program can also obtain a master's degree, if they choose.

15.     Students in the program apply to one of ten specific licensure pathways and are placed at a participating urban professional development school as a teacher candidate intern while simultaneously taking university classes.  One of the available pathways offered is the Graduate Elementary Licensure Program.

16.     The program is structured to allow elementary teacher candidates to spend an entire academic year as an intern "**in a single partner elementary schoo**l."

17.     Teacher candidates interns begin the internship gradually, with two days a week early on and increasing over time to five days per week by the end of the program where they complete a three-week "lead teach" period.

18.     During the three-week lead teach student interns assume full responsibility for the classroom.

19.     The three-week lead teach is the culmination of the year long internship period and occurs only after the intern student has successfully completed the requirements in the internship leading up to the three-week lead teach.

20.     Once teacher candidates complete the licensure portion of the program, they are eligible to receive their teaching license and apply for teaching positions in the state of Colorado.

21.     Ms. Robinson applied for and was accepted into the Graduate Elementary Licensure Program for the 2014- 2015 school year and began the Student Teacher Residency in the summer of 2014.  Upon successful completion, Ms. Robinson would have met the requirements to obtain her teaching license.

22.     Prior to enrolling in the program, Ms. Robinson already had a Bachelors Degree in Speech Communication and a Masters Degree in Communication Management.

23.     Ms. Robinson's sole purpose in enrolling in the program was to obtain her teaching license to fulfill a long held dream of becoming a public school teacher.

24.     When Ms. Robinson began the program in August 2014 she was pregnant at the very beginning of the first trimester of her pregnancy.

25.     On August 14, 2014 Flanders sent Ms. Robinson, along with all of the other students in the program, a Student Teacher Residency Gradual Release Calendar ("Gradual Release") that outlined the requirements for successfully completing the internship portion of the program.   (Ex. 1.)

26.     That calendar included a 41-week long program with requirements for classroom practice with specific dates and themes for learning. The students were scheduled to begin their three-week lead teach in March 2015.

27.     The internship component of the program had three separate blocks: 1) UEDU 5931 Internship & Lrng Comm 1 which began in mid August 2014 and ended mid October 2014; 2) UEDU 5932, Internship & Lrng Comm II, which began in mid-October 2014 and ended in December 2014; and 3) UEDU 5933 Internship & Lrng Comm III, which began in January 2015 and culminated with the three-week lead teach in March 2015 where the teacher candidates would be observed for spring evaluation. (Ex. 2.)

28.     Once the March three-week lead teach was successfully completed teacher candidates could begin the process of applying for their teacher license and applying for a teaching positions in the state of Colorado.

29.     In August 2014 Ms. Robinson was placed at Green Valley Elementary School ("GVE") to complete the internship component of the program.

30.     Giardina was the mentor teacher for the 5th grade class where Ms. Robinson fulfilled her internship requirements.

31.     At GVE there were four fifth grade classes. During the morning Giardina and another fifth grade teacher taught math and science to their respective homeroom classes while the other two fifth grade classes were taught literacy and other subjects in their respective home room classes. After lunch the students switched classrooms rooms so that Giardina taught math and science to another group of students while her homeroom students rotated to another classroom for literacy instructions.

32. This switching classes was referred to as "platooning."

33. Because Giardina was Ms. Robinson's mentor teacher for her internship, Ms. Robinson also platooned, which meant that her internship only included the math and science curriculum. During her three week lead teach she would primarily teach those two subjects. She observed some literacy classes but math and science were the only two courses that Ms. Robinson focused on during the entire eight months of her internship at GVE.

34. Ms. Robinson successfully completed both the UEDU 5931 Internship & Lrng Comm 1 in October 2014 and the UEDU 5932 Internship & Lrning Comm II component in December 2014, earning a grade of B in both components of the year long internship requirement.

35. Ms. Robinson disclosed her pregnancy to Gutierrez, Flanders, Chavira and Giardina in mid- fall of 2014. By November 2014 she was visibly pregnant. Her due date was March 22, 2015.

36. Ms. Robinson received positive feedback on her progress in the internship program and was told that she was on tract to begin her lead teach. In November 2014, Flanders sent her an e-mail confirming the successful completion of the requirements leading up to the three-week lead teach stating:

> Last month when we met with you, Venus, we had scheduled a follow up meeting with you today at GVE. Based on your current performance, we do not feel that this meeting is necessary. **You are on tract and are planning to do your lead soon** so I feel it would be more beneficial to talk about your progress at that time of your Fall Evaluation Meeting. (Ex. 3.)

37.     With this assurance that she was "on tract" Ms. Robinson looked forward to beginning her lead teach and completing the internship in preparation for getting her license.

38.     Ms. Robinson's three-week lead teach was initially scheduled to begin on March 23, 2015.

39.     By January 2015 Ms. Robinson was in the final trimester of her pregnancy. In order to successfully complete the lead teach before she went out on maternity leave Ms. Robinson requested that her lead teach be moved up.  Her request was initially approved.

40.     In that regard, on January 6, 2015 Ms. Robinson sent an e-mail to Flanders stating:

> I wanted to get your feedback on my Lead Teach process.  First, I do realize that the 3 weeks Lead Teach happens in March, however, based on the fact that I am pregnant and my due date is March 22, 2015, I talked with Mrs. Giardina and we came up with a plan that precedes March for the STR Lead Teach.  We were thinking that my Lead Teach should be:
>
> 1st Week – February, 23-27, 2015
> 2nd Week – March 2-6, 2015
> 3rd Week – 9-13, 2015
>
> Mrs. Giardina and I agreed that this plan would be the most feasible given my circumstances.  She will get me the topics that I will be covering during my Lead Teach at the end of this week/beginning of next week.  In the event that I go into labor and cannot complete my Lead Teach until after March we can revisit the days for my Lead Teach but so far things have been going well for myself and the baby physically.  Please let me know your thoughts about this so that Mrs. Giardina and I can begin to implement this plan.  (Ex. 4.)

41.     Flanders responded, "**I think that this sounds like a viable plan**.  I do want you all to think about how you, Venus, can get into a literacy class and weave that into your lead.  It is vital for you, Venus to have literacy experience not just for your

own learning but also for the perimeters for your CLDE coursework. I know that Stephanie was going to talk to all of you about this when she sees you next. Let me know if I can support you in any way." (Ex. 4.)

42. After Flanders agreed that moving the lead teach forward to February was a viable plan, Ms. Robinson was told that her lead teach could not be moved up because there was a concern that she would go into labor during the lead teach.

43. Ultimately, because of the concerns expressed that she might go into labor, Ms. Robinson was unable to begin her lead teach in February 2015.

**MS. ROBINSON ACADEMIC PERFORMACE BEFORE HER MATERNITY LEAVE**

44. CU, Denver has policies and procedures that address students having difficulty successfully completing their course work. Students who are not progressing toward completion of their degree in a satisfactory manner may be placed on Academic Probation followed by Academic Suspension if the student's performance does not improve.

45. Ms. Robinson was never on any academic probation or suspension and at all times she was a student at CU, Denver she was in "Good Academic Standing" as that term is defined by CU's policies: "Good academic standing requires a minimum GPA that is determined by the student's school or college."

46. In the program Ms. Robinson was in she was required to have a "B" grade on all course work and the three internship components that comprised the year-long internship requirement.

47. Ms. Robinson earned a "B" grade or above on all course work completed prior to her going on maternity leave as follows:

| | |
|---|---|
| CLDE 5030 | A |
| CLDE 5835 | A |
| SPED 5030 | A |
| UEDU 5040 | A |
| CLDE 5050 | A |
| CLDE 5140 | A |
| CLDE 5820 | A |
| UEDU 5010 | A |
| MATH 3040 | B+ |
| UEDU 5020 | B |
| UEDU 5931 | B |
| UEDU 5932 | B |
| UEDU 5050 | B |

(Transcript, Ex. 5.)

48.    Ms. Robinson's Grade Point Average was 3.75.  (Ex. 5.)

49.    The UCTE program also had in place a "Support Plan Protocol Concerning Teacher Candidate Performance" ("Protocol").  (Ex. 6.)

50.    This Protocol was developed to help teacher candidates who were struggling in developing the professional knowledge, skills, and dispositions necessary for effective teaching.

51.    The Protocol included four levels of intervention beginning with, Level I - proactive embedded support, Level II - inquiry phase, Level III, Collaboratively

Develop a Professional Action Plan and, Level IV – Professional Action Plan Review & Program Continuation Decision. (Ex. 6.)

52.     At the time Ms. Robinson went out on maternity leave she had successfully completed all of the requirements of the internship program leading up to her lead teach and at no time was she placed on any level of the Protocol nor was there any indication that she was struggling with any aspect of the program and needed to be placed on a Professional Action Plan to improve her academic performance.

## MS. ROBINSON BEGINS MATERNITY LEAVE

53.     Ms. Robinson went out on maternity leave on March 9, 2015 providing the following e-mail to Flanders:

> . . . I will start my Maternity Leave, Tuesday, March 09, 2015. It is my plan to be back at Green Valley Elementary either the last week in April or the first week in May. That is not 6 weeks but you both know how important finishing the process for getting my teaching license is as well as my endorsement and I am committed to completing this process. I have included this e-mail to my two Lead Teachers for Math/Science and Literacy as well as Sue just so that they are aware of my status and that I will be returning to GVE in about 4-5 weeks as well as back to Seminar. Sarah, you and Stephanie (possibly Sue) and I can get together in the next few weeks to hammer out the details of how my lead teach will look when I return from Maternity Leave and the completion of my course work. (Ex. 7.)

54.     Flanders responded "[w]hen you are ready to come back, let us know and we will all get together and plan out your re-entry. No matter what the date is, we can work with you. In addition to Stephanie and me, we will have Cindy Gutierrez, Sue Miller, and GVE staff. That way we can map out all the moving pieces and what needs to happen for you to successfully complete your residency." (Ex. 7.)

55.     At no time was there any discussion that Ms. Robinson's performance in the classroom, leading up to the attempted lead teach prior to her going on maternity

leave, was in any way deficient or that there was a need to put her on an Action Plan to address any concerns with her academic performance.

## RETURN FROM MATERNITY LEAVE AND SECOND ATTEMPT TO COMPLETE LEAD TEACH

56.     Ms. Robinson gave birth on March 11, 2015.  On April 1, 2015 she sent Flanders another email again attempting to schedule her lead teach stating:

> I am into the third/fourth week of Maternity Leave and I am thinking about my Lead Teach as well as completing the last of my classes (Seminar).  I am thinking that we could meet perhaps in the next week or two determine my next steps, in terms of my classes as well as my final 3 week Lead Teach, specifically to determine and finalize those details that would be great.  My thought is that if we plan it just right I can complete my Lead Teach prior to GVE being released for their Summer Break! When you folks get back from Spring Break let's all get together.  (Ex. 8.)

57.     Ms. Robinson was again told that she could not begin her lead teach.  The reason stated was because there was not enough time in the school year for her to complete the lead teach given end of school requirements for the students.

58.     However, during discussions with either Flanders, Gutierrez and/or Chavira, a concern was expressed that Ms. Robinson was coming back to school too soon after her pregnancy.

59.     Instead of allowing Ms. Robinson to complete her lead teach, which was the primary remaining requirement she needed prior to obtaining her teaching license, Gutierrez, Chavira and Flanders met with Ms. Robinson on April 16, 2015 and gave her three re-entry options to complete the Program.  (Ex. 9.)

60.     Even though she had already completed all of the requirements from the Gradual Release leading to her lead teach, the three re-entry options after her maternity

leave added additional requirements that were not included in the original Gradual Release that Ms. Robinson was following prior to her pregnancy and maternity leave.

61.     Option 1 was the "Extended Residency Internship Fall 2015, which required Ms. Robinson to take an incomplete in UEDU 5933, the final student teacher residency internship and then do 9 additional weeks of residency in the fall of 2015. (Ex. 9.)

62.     Option 2 was "Transition to Denver Teach Today Alternative Licensure – must secure a teaching position for fall."   This option would have allowed Ms. Robinson to be automatically accepted into the licensure program and apply for jobs as a teacher of record for the 2015/2016 school year.   Ms. Robinson would have been required to get a job in DPS by October 1, 2015 but the program cost $2,500.00.   (Ex. 9.)

63.     Option 3 was similar to Option 1 but she would be required to complete an extended residency for the entire semester.   (Ex. 9.)

64.     None of these options satisfied Title IX's requirement that students returning from maternity leave must be placed in the same academic status that they were in prior to the maternity leave.

65.     At some point Ms. Robinson also raised the possibility of completing the lead teach during the summer as there were some schools within Denver Public School system that held summer school for its students.   However, she was told that she could not complete the lead teach during the summer.

66.     Since Ms. Robinson would not be allowed to continue her lead teach as she would have prior to going out on maternity leave and because she could not afford the $2,500.00 cost of Option 2, she chose Option 1 as the lesser of the three evils even

though it added an additional nine weeks that were not required prior to going on maternity leave.

67.     Ms. Robinson believed that upon her return from maternity leave she should have been allowed to complete her lead teach at GVE or a similar school as if she had not gone out on maternity leave.

68.     Instead, Ms. Robinson was forced to accept an incomplete for the internship component of the Program even though she was willing and able to complete the lead teach beginning in February 2015 and continuing after her return from maternity leave, if necessary. This would have permitted her to graduate from the program and obtain her teaching license during the summer of 2015 then find a teaching job for the 2015/2016 school year.

69.     During the April 16, 2015 options meeting, at no time was there any discussion that Ms. Robinson's performance was lacking in any respect or that there was a need to place her on an Professional Action Plan to address any deficiencies in her academic performance during her internship at GVE.

70.     By mid June 2015 Ms. Robinson learned that she would be placed at College View Elementary ("College View") to complete Option 1.

71.     At the time Ms. Robinson was not aware that College View did not operate in the same manner as GVE (platooning) so this placement did not raise any concerns.

72.     On June 22, 2015 Flanders sent an e-mail to Mulcahy, Ms. Robinson's new mentor teacher at College View, confirming that Ms. Robinson was in the program "to make up time that [she] missed during [her] maternity leave." (Ex. 10.) There was no

mention that there were any concerns with Ms. Robinson's academic performance or the need to place her on a Professional Action Plan.

## THE VENUS GRADUAL RELEASE CALENDAR

73.     In preparation for her lead teach at College View, Gutierrez and Flanders met with Ms. Robinson on or about August 14, 2015 to discuss her reentry into the program after her maternity leave.

74.     No one at the meeting mentioned that Ms. Robinson had any performance deficiencies while she was completing her internship at GVE or the need to place her on a Professional Action Plan because she was "struggling."

75.     At the meeting Gutierrez presented Ms. Robinson with the "Venus Gradual Release Calendar".  (Ex. 11.)

76.     The Venus Gradual Release Calendar differed in material respects from the Gradual Release Calendar that Ms. Robinson and the rest of the students in the program had been presented with as they began the program in August 2014. (Compare Ex. 1 with Ex. 11.)

77.     The most significant difference was that another column was added to the Venus Gradual Release Calendar for "LEAP Rating Requirement on observation."

78.     LEAP stands for Leading Effective Academic Practice.   The LEAP Handbook for 2014/2015 describes LEAP as a:

> Denver Public Schools' (DPS) teacher growth and performance system. DPS created LEAP to measure teacher effectiveness with the goal of ensuring an excellent teacher in every classroom with support from highly effective school leaders.  District leaders, school leaders, teachers, Denver Classroom Teachers Association (DCTA) members and other stakeholder groups collaborated on LEAP's design to establish a clear set of expectations against which teacher performance is assessed.  As a fully-functioning system, LEAP strives to help teachers identify areas of

strength and growth through more meaningful feedback conversations, and well-designed and implemented coaching cycles and professional learning sessions so that teachers can develop as professionals and continue meeting the needs of students.

(Ex. 12.)

79.     LEAP is an evaluation tool applicable to licensed DPS teachers to evaluate their performance in the classroom.  LEAP was not intended to be an evaluation tool for interns.

80.     In addition to adding the LEAP requirements the "Themes for Learning" had been completely changed from simply "Differentiation" in the Spring Semester when Ms. Robinson was originally scheduled to begin her lead teach to a complete listing of all of the LEAP indicators including LE 1, LE 2, LE3, LE4, I1, I2, I3, I4, I5, I6, I7, I8, P1, P2, P3 and P4.

81.     Under the Venus Gradual Release, Ms. Robinson was required to meet these requirements on all of the listed indicators of either effective or approaching and 1/3 effective, 2/3 approaching at certain dates identified in the Venus Gradual Release Calendar that were not included in the original Gradual Release Calendar that Ms. Robinson and the other students had to comply with prior to Ms. Robinson going out on maternity leave.  (Compare Ex. 1 with Ex. 11.)

82.     While interns were expected to work towards becoming proficient in all of the LEAP indicators, those indicators were not used to determine whether a student would be dismissed from the program.

83.     Neither the Gradual Release Calendar nor the Venus Release Calendar indicated that students would be dismissed from the program if they were not rated as approaching or effective on any of the LEAP indicators.

84.     Ms. Robinson was held to a different standard, as set forth in the Venus Gradual Release Calendar than the rest of the students in the program who only had to meet the standards in the August 2014 Gradual Release Calendar.  These were the same standards that Ms. Robinson met before she went out on maternity leave.

85.     At the end of the meeting Gutierrez indicated that she would put together a re-entry plan based on their discussion for Ms. Robinson to finish her licensure requirements of the program.

**THE LEVEL III PROFESSIONAL ACTION PLAN**

86.     After the August 14, 2015 meeting, instead of sending Ms. Robinson a re-entry plan, Gutierrez sent her a Level III Professional Action Plan, which was the third level of the "Support Plan Protocol Concerning Teacher Candidate Performance" that was used to address teacher candidate performance concerns.

87.     The stated purpose of the Level III Action Plan was to "**optimize the strengths of the Teacher Candidate in order to address identified areas that need focused attention and/or improvement.**  (Emphasis in Original.) (Ex. 13, Ex. 14.)

88.     The Level III Professional Action Plan specifically identified the circumstances/history leading to the development of the Professional Action Plan as Ms. Robinson stepping "out of the residency to have her baby."  (Ex. 14.)

89.     Prior to going out on maternity leave there had been no discussions with Ms. Robinson that she had any "identified areas that need focused attention and/or improvement" or that she had any performance problems that needed addressing.

90.     Under Level IV of the Support Plan Protocol, students were evaluated, then a recommendation was made that the student be removed from the Support Plan

Protocol because they had successfully completed the Level III requirements; given additional time; or dismissed from the program.

91.     The Support Plan Protocol deviated from the University's policies on academic probation and suspension by allowing a unilateral decision to terminate a student from a program even when the student was in academic good standing.

92.     The Level III Professional Action Plan was highly complementary of Ms. Robinson's strengths in the classroom stating:

> Venus is a very passionate individual very focused on wanting to be a strong teacher. Venus connects well with students, and has a great deal of life experiences to bring to the classroom. She's extremely passionate about history and enjoys teaching social studies and science. Erin indicated she shows a strong interest in knowing new people in the building, what is their role, how can they help us, etc Also very eager to learn and desire to want to grow. Sarah shared Venus has the ability to connect on a personal level with students, particularly tough students She also uses her humor and leverages the ability to not take herself too seriously from a reflective standpoint. Stephanie indicated her unique ability to understand parenting, even in the way she was parented. Also she does not shy away from engaging in difficult conversations related to race that are critical in our field of urban education.

(Ex. 14.)

93.     The Level III Action Plan set a date of September 18, 2015 to meet to discuss Ms. Robinson's progress.

94.     At no time was there any discussion that Ms. Robinson could not begin her lead teach and would be dismissed from the program on September 18, 2015 if any of the goals set on the Level III Action Plan had not been met.

95.     Placing Ms. Robinson on the Level III Professional Action Plan for the express reason that she stepped "out of the residency to have her baby" violates Title IX

where the next step of the process could lead to Ms. Robinson's dismissal from the program.

96.     Prior to going out on maternity leave Ms. Robinson was not on a Level III Professional Action Plan or any other level. Had there been identified concerns with her performance she would have first been given the opportunity to improve through Levels I and II.

97.     Neither Ms. Robinson, Gutierrez nor anyone else signed the Level III Professional Action Plan in August 2015.

98.     After receiving the Level III Professional Action Plan Ms. Robinson decided to attempt to make the best out of the situation and again placed her focus on completing the program to fulfill her long held dream of becoming a public school teacher.

**MS. ROBINSON BEGINS HER INTERNSHIP AT COLLEGE VIEW**

99.     Ms. Robinson began the third and final phase of her internship at College View on August 17, 2015 in the 5th grade with Mulcahy as her mentor teacher. Students began classes a week later on August 24, 2015.

100.     College View was different from GVE in many respects. The most significant difference was that Ms. Robinson would not be "platooning" at College View like she was at GVE before she went on maternity leave.

101.     At GVE Ms. Robinson had eight months as an intern (from August 2014 through March 2015) to learn the two subject areas she was platooning in. During this eight-month internship period she was able to observe her mentor teacher to learn the expectations of the Program and the school, consistent with the gradual release,

gradually take on more responsibility with the students and the preparation of lesson plans up to the lead teach.

102. Having Ms. Robinson complete the final phase of her internship at College View placed Ms. Robinson at an extreme disadvantage. Because College View did not platoon, Ms. Robinson had to now prepare multiple unfamiliar subject matter lesson plans and learn the expectations of the new school and her new mentor teacher in just three weeks, something that she had been given eight months to learn while at GVE.

103. Based on the Venus Gradual Release Calendar, her three-week lead teach was to begin on September 28, 2015. Prior to the lead teach she was to be guided through specific performance goals to prepare her for the lead teach. She was told that she would be given the opportunity to meet these new goals and get any needed assistance in ensuring that she was ready for the lead teach. This was critical as she was now responsible for significantly more planning in areas that she was unfamiliar with.

104. At no time was Ms. Robinson told that she would be removed from the program before beginning her lead teach. In fact, she was assured that her final performance would only be evaluated **during** her lead teach and that the instructions, guidance and coaching that she was receiving prior to the three week lead teach were to prepare her for the lead teach.

105. Initially, the lesson plans Ms. Robinson submitted were well received. On August 23, 2015 Ms. Robinson submitted her first lesson plans in preparation for the first day of school and Mulcahy commented "[t]his looks great! I like your Spanish piece!:)) You are a rockstar for looking at the standards:))  I would be happy to go through the lesson with you during lunch tomorrow.  (Ex. 15.)

106.     She also submitted lesson plans for math and literacy on September 3, 2015 and Chavira commented, "[t]hese look good, the only suggestion I would say, is writing out the 5 questions that you are going to ask for the exit ticket in your math lesson." (Ex. 16.)

107.     Mulcahy was also highly complementary of Ms. Robinson's initiative, energy and overall performance in the classroom.  However, after only two weeks after the students began it became apparent to Ms. Robinson that she was not going to be allowed the opportunity to complete the Program.

108.     In that regard, Ms. Robinson's first substantive lesson plan was due on September 11, 2015.   This was a huge undertaking for her as it was the first time that she was completing lesson plans for multiple subject matters, as opposed to the math and science lesson plans she completed while platooning at GVE.

### SEPTEMBER 9 – 10, 2015
### MS. ROBINSON'S REQUEST FOR HELP

109.     Ms. Robinson submitted draft lesson plans on September 9, 2015 at 12:36 a.m. and additional lesson plans on September 10, 2015 at 1:34 p.m.  She was very specific with Mulcahy sending her an e-mail expressing that she needed help in finding a place to start with the lesson plan as the expectation and requirement was not something that she did while at GVE stating:

> Good morning ☺ I am awake and you were right that I would spend a lot of time with the development of my LPs as a new Teacher.  I have completed the Morning Meeting LP (Social Intelligence), Math Small Group, Literacy and ELD.  With regard to the ELD (I saw many different LPs that cost money.  The ones that I saw that were free had worksheet for the children to use but I did not see or find an actual curriculum that specifically focuses on that. The EL Block Lesson 5 did discuss prefix, suffix and root words but not in depth. **I created an Objective and started with a plan that I thought looked like the**

**direction I should go but I am really not sure about this one. This would be the first time I have ever developed an English Language Development LP, and I do not want mess this up as I will need know how to do this for my Lead Teach. I really need your help in finding a place to start. In any case I wanted to provide my LPs for your review with the understanding that I know with your feedback I will modify.** I'll see you tomorrow. (Ex. 17.)

110. Instead of providing her with the help and feedback that she requested, Mulcahy responded that she wanted Ms. Robinson to learn to do this on her own stating, "I can help you but part of teaching is that flexibility to plan lessons on your own. The more practice the easier it gets. When planning, start with the objective or standard and then plan backwards. **I would like you to try this on your own and give you feed back tomorrow."** (Ex. 17.)

### FRIDAY – SEPTEMBER 11, 2015

111. Ms. Robinson continued to work on the lesson plans but only partially completed them by Friday. Gutierrez had now become involved and sent Ms. Robinson an e-mail asking her "[w]hat could you have done differently to get your plans done this week?" Ms. Robinson responded, "giving me more time is what I need." (Ex. 18.)

112. Gutierrez then gave Ms. Robinson a laundry list of requirements that she could not possibly meet in the time frame requested.

113. The next day, Gutierrez, Flanders, Chavira and Mulcahy met with Ms. Robinson after school and told her that she needed to sign the Level III Professional Action Plan that Gutierrez had sent to her on August 14, 2015 but had never been signed.

114. Ms. Robinson signed the Level III Professional Action Plan on September 11, 2015 with assurance from Gutierrez that she would be given the level of support and time required to meet the goals of the Action Plan. (Ex. 19.)

115.     The Action Plan was the exact same Action Plan that Gutierrez had e-mailed to Ms. Robinson in August.    (Compare Ex. 14 with Ex. 19.)

116.     At no time was there an indication that the Action Plan was developed to address problems with Ms. Robinson's performance thereby putting her on notice that she could be dismissed from the program on March 18, 2015 if she did not meet certain indicators before she did her lead teach.

117.     Moreover, Ms. Robinson had already completed **all** of the requirements leading up to her lead teach while she was at GVE prior to her maternity leave.

118.     Gutierrez's request that Ms. Robinson sign the Action Plan on September 11, 2015 was a thinly veiled attempt to get Ms. Robinson's signature because Gutierrez had already decided to terminate her from the program.

### SATURDAY, SEPTEMBER 12, 2015

119.     Instead of considering the accommodation Ms. Robinson requested of additional time, Gutierrez instead continued to set time limits that could not be met by Ms. Robinson, that she have all plans completed by noon.

120.     The expectations asked of Ms. Robinson were unrealistic and intended to set her up for failure.  In spite of her efforts, Ms. Robinson was not able to complete all of the lesson plans by the noon deadline simply because it was not possible to do so with the level of detail, research and insight that was necessary to timely complete the lesson plans.

121.     Gutierrez then issued another ultimatum stating, "[w]e are giving you one last chance to submit ALL lesson plans using the expected format and scripted in detail as well as ALL accompanying materials (ppts, worksheets, word wall materials etc.) no

later than 9 am tomorrow for Erin to review and give feed back" and "if everything is not submitted at the quality and format agreed upon by 9 am tomorrow you will not continue teaching next week and we will be meeting at UCD to discuss dismissal from the program." (Ex. 20.)

122. Gutierrez did not have the authority to unilaterally dismiss Ms. Robinson from the program. Ms. Robinson was in academic good standing and, according to the CU, Denver policies, she could not be dismissed from the program if she was in academic good standing

123. Moreover, Ms. Robinson had successfully completed all of the requirements of the internship while at GVE prior to going out on maternity leave and had no performance issues that would cause her to be on the Support Plan Protocol.

124. Moreover, Level I of the Protocol required "Proactive Embedded Support" **before** a student could be placed on Level III, which was the Professional Action Plan.

125. Gutierrez's statements were not indicative of the level of support, guidance and coaching that Ms. Gutierrez and the rest of the team were required to provide Ms. Robinson in completing this program.

126. Ms. Robinson responded to Gutierrez's threats stating:

> I am very upset with how this is transpiring as well. I am doing the absolute best that I can do and while I think that everyone has been supportive. The support seems to be something that is spoken but can really not be attained. I have tried my best to get things in on time but the work that is asked of me is at best unrealistic, as there do not seem to be enough hours in the day to get all things done in the way that the program wants them done. I had been sending my LPs in but then the program wanted them done in a different format, which I did not have to do with my last placement as there was a LP format that she had and that is what I used. It made no sense to do two different LP's. Additionally, there are two subjects now, Geography and the Expeditionary Learning, that already have an accompanying LP that I must do anyway. It seems

absolutely pointless to redo a lesson plan that I am already mandated to do and that LP cannot be changed in any case. There is no need to repeat that process, but I have done that anyway. I can send the last bit of my LPs to Erin, but I am sure my LPs will not be good enough for you folks and I am concerned that the decision has already been made and this becomes par for the course. Having said that I believe that there must be a better way to get through this very rough and uncomfortable process in completing the program. I only have 3 weeks of a lead teach to go and I don't think that it makes any sense to try and dismiss me from the program based on some issues that can be resolved. I am thinking, that **if anything, my final Lead Teach should be based on two classes as that is what was expected of me when I came into the program. In fact I suspect that if any of the other members of the cohort I was in and that platooned, were placed in my situation they would struggle as well.** I cannot imagine that the program should purposefully be this difficult, and I can't really understand why this last bit of my lead teach has become so difficult, when it should not be the case. I absolutely want to finish this process but perhaps this is just not a good fit, meaning the time constraints that the program has in place do not match what I am capable of doing or have been taught how to do. While it seems that everyone understands the difficulties in getting this work done **it seems to me that I am now being placed in a situation that make it impossible to complete. I have gone from planning two classes to planning between 5 and 7 classes in the span of just three weeks. While others in my cohort have had an entire year to learn how to plan for between 5 and 7 classes each day. Knowing what I now know, this is not a fair placement. I would like to complete the program but I really feel that things have been presented in a way that I cannot in the time that the program thinks is sufficient.** (Ex. 20.)

127. Although, expressing her frustration with these requirements Ms.

Robinson continued with the work assigned to her. On September 12, 2015 she

submitted lesson plans at 1:48 p.m. and 5:25 p.m. stating:

Dear Cindy, Erin, Stephanie and Sarah, after speaking with Cindy earlier this afternoon and reviewing Cindy's e-mail and Erin's e-mail also sent earlier this afternoon I am appreciative of your candor and willingness to guide me through this program. After much consideration my commitment to the program is still strong. I appreciate Cindy's words and her expression of support and I want to express to all of you that I am not giving up. **I am wiling to put in the extra effort and time to successfully complete the program. I ask that you continue your support and while I may not get everything right the first time but I can guarantee that I will finish this program**. I will complete all of the lessons that

Erin identified in her e-mail sent to me at 2:13 pm. Since receiving that e-mail I completed and sent Lesson Plans for Literacy, Small Group Math, Morning Meeting-Social Intelligence, Writing to include Writing Exit Tickets and Read-A-Loud. Prior to receiving Erin's e-mail I also sent all the Lesson Plans for Math Whole Group and ELD. both having Exit Tickets. Based upon Erin's E-mail the only things I still need to do are a Power Point for Math and the Geography LP the Word Wall is done. I will get the PP for Math and Geography before 9:00 am tomorrow as directed. Erin I appreciate whatever feedback you can give and I **will** get this right. If you have the time tomorrow morning I'd love to buy you a cup of coffee and personally get your feedback on the materials that I've sent. If we can't meet in person I am available any time by phone**. I want to emphasize that my commitment to finish this program is unwavering.** Cindy if we still need to talk tomorrow let me know by e-mail and will give you a call tomorrow. (Ex. 20.)

### SUNDAY – SEPTEMBER 13, 2015

128. On Sunday, September 13, 2015, Gutierrez, promised Ms. Robinson that coaching and feedback would continue in order to give her the opportunity to meet the expectations of the program. In an email on Sunday at 5:37 p.m. Gutierrez indicated that Mulcahy would help guide Mr. Robinson in the lesson plans that needed to be submitted by Friday (September 18, 2015). (Ex. 21.)

129. Gutierrez also indicated that she and Mulcahy would continue to **provide Mr. Robinson with "in-depth level of feedback one more week on [her] lesson plans (Erin can choose to provide that feedback in the way that works best for her/time she has; you and I will plan to zoom conference call again next weekend [September 19 – 20] as you work to revise lessons/materials.)"** (Ex. 21.)

130. Mulcahy also indicated that she had seen "**an extremely positive openness and willingness to do what it takes and carefully listen to and act on the feedback given to [Ms. Robinson] in the past 24 hours – keep it up as this is what is**

going to help your grow and reach the levels of performance that are expected!" (Ex. 22.)

131.    Finally, Gutierrez indicated "thank you for your continued attention to this and obviously working hard last night to submit the lesson plans and accompanying material.  **I just spoke with Erin and she and I are 100% committed to giving you the high level of feedback you need to help you reach the performance expectations of the program.  We definitely see some strengths in your lessons and also have some more explicit feedback for you.** (Ex. 23.)

132.    Taking Gutierrez's and Mulcahy's coaching and feedback to heart, Ms. Robinson did extensive revisions on all of the lesson plans on Sunday afternoon and into the evening.  As to the revisions to the math lesson plans, Mulcahy was very satisfied with the revisions, writing in an e-mail "**Thank you for your math LP's They look great!.  Can you please send me the 3 levels of exit tickets this evening.  *** The powerpoint looks very nice.***.** (Ex. 24)

133.    Mulcahy was also complimentary on the revisions Ms. Robinson did to the writing lesson plan using a resource that Ms. Robinson had found on the internet stating, "Erin I am attaching my revised LP for Writing with modifications based on the feedback from you and Cindy.  I am also attaching the "Learning How to Write a Paragraph" from David Dye's workshop.  I thought it was quite effective in modeling the LP elements.  This was a good exercise.  (Ex. 25.)

134.    Mulcahy responded, "**David Dye's has a great approach on how to teaching the paragraph writing process.  This is what my 4th grade team used last year.  I'm glad you found this resource.**" (ex. 25.)

135.    Mulcahy continued to provide positive feed back to Ms. Robinson and updated her on the plans for the week of September 21 – 25 stating, "**Venus, we will talk further on Friday (September 18, 2015) about when you will start your LEAD teaching for the mandatory 3 week period. 3 weeks of planning is hard work and I want to make sure you are practicing with a few days this week and next week. I want to give you as much support as you need so planning those weeks is fun and that you have the tools to be successful. The following week is Balarat, so LEAD teaching will start sometime after September**. (Ex. 26.)

### MONDAY – SEPTEMBER 14, 2015

136.    On Monday, September 14, 2015 Mulcahy was out of the classroom, substituting most of the day for another teacher who was absent. Ms. Robinson implemented the lesson plan that had been developed for Monday and provided instruction to the children without oversight from Mulcahy. There were no concerns expressed to her with her ability to instruct the class alone. After classes ended Ms. Robinson began working on the lesson plans that were due on Friday, September 18, 2015.

137.    Ms. Robinson believed this would show her initiative and continued commitment to completing the program as Gutierrez indicated. At 10:54 p.m. Ms. Robinson submitted a **first draft** of the plans to get Gutierrez's and Mulcahy's continued feedback and coaching stating:

> Erin I know that these LP's are not due until Friday, but I thought it would be a good idea and start sending you what I have prepared for your review. I have attached the Morning Meeting, Read-A-Loud, and Literacy Lesson 8. I will work on Lesson 9, Geography and Small Group Math tomorrow. I will be staying after school again to get these LPS completed and in to you by Wednesday." (Ex. 27.)

**TUESDAY – SEPTEMBER 15, 2015**

138.    On Tuesday, September 15, 2015 Mulcahy was still absent from school. The substitute teacher did not show up so Ms. Robinson was alone in the classroom for the entire day teaching the kids the lesson plan that she had prepared and that had been reviewed, revised, reviewed again and approved over the weekend.   Again, after classes ended she continued to work on lesson plans that were due on Friday, September 18, 2015 and Mulcahy provided her with comments and feedback on what had been prepared via e-mail.   This is the feedback Ms. Robinson expected and welcomed in attempting to do whatever it took to complete the program.

139.    Mulcahy gave no indication whatsoever that the lesson plans Ms. Robinson submitted on Monday night were deficient in any manner. In fact, she continued to provide suggestions and comments, which Ms. Robinson incorporated in her planning processes.

140.    Mulcahy also indicated that she knew that "there has been some lessons that have needed to be re-taught and that's ok but I want you to keep in mind that we have so much to teach in one year and we have to be mindful of that .  That's why it's SO important that the delivery is dead on.  Like I said, re-teaching is going to happen based on student data but if it's happening often, the reflections piece is critical!  We can talk about this more on Thursday but I want you to keep this in mind."   In closing, Mulcahy asked Ms. Robinson to send her "some reflective notes by Wednesday at 6:00 for math and literacy so [she] can prepare the lessons for Thursday and Friday.  Thanks for doing this!:)"

141.    On Wednesday Ms. Robinson also received feedback from another educator at the school, Jane Paz.  Her feedback centered on the objective needing to "be very clear and in kid language".   At no time was there any indication that Ms. Robinson's performance in the classroom or the lesson plans she prepared were so deficient that warranted immediate dismissal from the program.

142.    Gutierrez also provided feedback on the draft lesson plan. Her comments were extremely critical and concerned the adequacy of the literacy lesson plan that Ms. Robinson had cut and pasted from the lesson plan that she was required to use per Mulcahy's instructions.

143.    Apparently Gutierrez was not aware that the literacy lesson plan Ms. Robinson submitted was scripted from the Expeditionary Learning curriculum that Mulcahy had instructed her to use.   Ms. Robinson did not have the discretion to change the lesson plan.   She confirmed with Mulcahy that she was supposed to use the Expeditionary Learning Lesson Plan on September 16, 2015:

> Erin, not sure if you have had a chance to look over my Literacy Lesson Plan in detail.  What I did was use the LP from the EL unit that I am supposed to be teaching.  In fact the majority of the Literacy lesson plan I submitted yesterday was copied directly from the Expeditionary Learning:  Grade 5 Module 9.  **Based on our discussions it was my understanding that my Literacy Lesson was supposed to be taken directly from the Expeditionary Learning Module.  Is that correct??  I am glad I submitted it early to give me chance to get everything exactly right by Friday.**  Let me know whether or not I should be using the Literacy Lesson Plan.

(Ex. 28.)

**WEDNESDAY – SEPTEMBER 16, 2015**

144. Mulcahy confirmed that Ms. Robinson was required to use the Expeditionary Learning Lesson Plans that she had used to prepare the draft lesson plan submitted to Gutierrez and Mulcahy on Monday.

145. On Wednesday, September 16, 2015, Mulcahy was again absent all day. A substitute teacher was present for half the day but Ms. Robinson instructed the students all day using the lesson plans she prepared. Gutierrez, visited the classroom approximately an hour and a half. Gutierrez provided specific coaching points/feedback for the math lesson and Read Aloud she observed, identifying **positive** points as follows:

> STRENGTHS: your communication and follow-through with behavior expectations were much stronger (this was a coaching point from Jane yesterday for an area to improve)! Definitely stronger at the beginning of the lesson; some challenges at the end trying to transition from exit tickets to small group, but most effective strategies were clearly stating what you would do (I'll begin when you have your notebooks out) and commenting on who was demonstrating positive behavior (I see table 1 is ready, table 2 is ready, etc.) (Ex. 29.)

146. Gutierrez identified areas for improvement to include checking for understanding and explicit teaching/modeling regarding teaching an algorithm. Gutierrez's comments on the "Script" were also informative and exhibited a level of coaching and feedback consistent with the expectation that Ms. Robinson was progressing and moving forward to completing her lead teach as Gutierrez indicated on September 13, 2015.

147. Mulcahy also informed Ms. Robinson that Jen Nelson would be observing her the next day because a "DR perspective will help guide [my] practice." At no point was Ms. Robinson told that Ms. Nelson would be evaluating her performance as a means to dismiss her from the program.

148.     Ms. Robinson also sent Mulcahy the requested feedback on the lessons plans that Mulcahy had requested the previous day.

**SEPTEMBER 17, 2015**

149.     On Thursday, Mulcahy was back in the classroom and taught the whole day.   Ms. Robinson continued to work on the lesson plans for the following week. There was no indication that there were any problems or issues with anything that Ms. Robinson had done.

150.    On Friday morning Ms. Robinson provided classroom instructions to the students.  Later that day she submitted the lesson plans for the following week as she had been instructed.  After school ended she was told to come to the principal's office for a meeting at which Gutierrez informed her that she was dismissed from the program.

151.    Gutierrez did not have the authority to unilaterally dismiss Ms. Robinson from the program.

152.    After Ms. Robinson's dismissal, Gutierrez gave her a copy of the Level III Professional Action Plan that she had signed a week earlier on September 11, 2015 but had been first presented in August.

153.    The Action Plan had been altered to include handwritten references to progress notes and a "Final Recommendation After Review" box was checked, dismissing Ms. Robinson from the program.

154.    The stated reason for terminating her from the program was that Ms. Robinson had not met the expectations of the "Action Plan" provided to her on August 14, 2015.  (Ex. 30.)

155.    Gutierrez also identified LEAP observations, walkthrough observations and the Venus Gradual Release in support of the decision.

156.    However, the observations and feed back were a continuous part of the program, particularly at a new school, that student interns were provided to assist them in becoming proficient teachers.

157. The reasons Gutierrez identified for terminating Ms. Robinson from the program were pretextual.

158. Gutierrez had made the commitment that she would meet with Ms. Robinson over the weekend of September 19 – 20 to provide her with in depth feed back and dismissing her from the program before providing those opportunities was an arbitrary and capricious decision.

159. In support of the dismissal, Gutierrez indicated that Mulcahy had completed a "formal observation" of Ms. Robinson on September 17, 2015 and that the information contained therein would be shared with Ms. Robinson.

160. Neither Gutierrez nor Mulcahy ever provided Ms. Robinson with the "formal observation" that Mulcahy had allegedly prepared.

161. Ms. Robinson had spent the last year successfully completing the licensure requirements of the program.

162. In order to be dismissed from the program for academic reasons, at a minimum, Ms. Robinson would have had to have been on academic probation or suspension.

163. Gutierrez has indicated that Ms. Robinson may **never** re enroll in the program to complete the requirements to become a licensed teacher through **any** program at the University of Colorado.

164. In short, Ms. Robinson is barred for life from ever completing her licensing requirements after spending over a year successfully pursuing that goal.

## CAUSES OF ACTION ASSERTED AGAINST CU, DENVER

## FIRST CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX
(Based on the failure to allow Ms. Robinson to begin
her Lead Teach prior to her maternity leave.)

165.    Robinson incorporates herein all paragraphs as alleged above.

166.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides in

relevant part:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under
> any education program or activity receiving Federal financial assistance.

167.    The Office of Civil Rights in the U.S. Department of Education ("ED") is

responsible for enforcing laws prohibiting discrimination in federally assisted educational

programs and activities, including Title IX.

168.    ED's regulation implementing Title IX specifically prohibits discrimination

against a student based on pregnancy, childbirth, false pregnancy, termination of pregnancy, or

recovery from any of these conditions.  34 C.F.R. § 106.40 (b)(1) provides:

> *Pregnancy and related conditions.* (1) A recipient shall not discriminate
> against any student, or exclude any student from its education program or
> activity, including any class or extracurricular activity, on the basis of such
> student's pregnancy, childbirth, false pregnancy, termination of
> pregnancy or recovery therefrom, unless the student requests voluntarily
> to participate in a separate portion of the program or activity of the
> recipient.

169.    When a student returns to school after maternity leave, she must be allowed to

return to the same academic and extracurricular status as before her medical leave began.  34

C.F.R. § 106.40 (b)(5).

170.     The ED has also published guidance for schools regarding the actions schools should take in Supporting the Academic Success of Pregnant and Parenting Students, Seth Galanter, Dear Colleague Letter, U.S. Dept. of Educ. at 1 (June 25, 2013), available at http://www2.ed.gov .

171.     Pursuant to the Department's guidance, schools cannot treat a pregnant student differently from other students being cared for by a doctor, even when a student is in the later stages of pregnancy;  schools should not presume that a pregnant student is unable to attend school or participate in school activities.

172.     Further, to ensure a pregnant student's access to its educational program, when necessary, a school must make adjustments to the regular program that are reasonable and responsive to the student's temporary pregnancy status.

173.     Ms. Robinson's request to begin her lead teach on February 23, 2015 was a reasonable adjustment to allow Ms. Robinson to timely complete the program during the 2014/2015 school year.

174.     Both Giardina and Flanders were agreeable to the plan and considered it to be a "viable option."

175.     However, Ms. Robinson was ultimately told that she could not begin her lead teach on February 23, 2015 because there was a concern that she might go into labor.

176.     Had Ms. Robinson completed her internship before the end of the 2014/2015 school year she would have immediately been able to receive her teacher's license and apply for teaching positions consistent with the goal of the program.

177.   Other students who began the program with Ms. Robinson completed their internship before the end of the 2014/2015 school year, have obtained their teaching license and are now licensed teachers who have been hired as teachers for the 2015/2016 school year and are now earning a full teacher's salary.

178.   As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**SECOND CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on the failure to allow Ms. Robinson to begin her Lead Teach in
April 2015 or summer 2015 after she returned from maternity leave.)

179.   Robinson incorporates herein all paragraphs alleged above.

180.   There were summer programs for elementary students in Denver Public Schools where Ms. Robinson could have completed her lead teach.  CU, Denver also had an option to allow Ms. Robinson to begin her lead teach and complete the program during the summer 2015. CU, Denver refused to provide Ms. Robinson with this option.

181.   Had Ms. Robinson completed her internship during the summer 2015 she would have immediately been able to receive her teacher's license and apply for teaching positions before the 2015/2016 school year consistent with the goal of the program.

182.   Other students who began the program with Ms. Robinson completed their internship before the end of the 2014/2015 school year, have obtained their teaching license and

are now licensed teachers who have been hired as teachers for the 2015/2016 school year and are now earning a full teacher's salary.

183.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**THIRD CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on requiring Ms. Robinson to select options that imposed greater requirements than what she was required to complete prior to going on maternity leave.)

184.    Robinson incorporates herein all paragraphs alleged above.

185.    After Ms. Robinson returned from her maternity leave Defendant CU presented Ms. Robinson with three options to complete her internship.

186.    One of the options required Ms. Robinson to pay $2,500.00.  The other two options required Ms. Robinson to repeat portions of her internship that she had already successfully completed.

187.    Defendant, CU Denver's requirement that she complete work that she had already successfully completed prior to her pregnancy violates Title IX.

188.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**FOURTH CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on Placing Ms. Robinson on the Venus Gradual Release)

189.     Robinson incorporates herein all paragraphs alleged above.

190.     When Ms. Robinson returned from maternity leave she was given a "Venus Gradual Release" document that required her to meet certain standards that she was not required to meet prior to going on maternity leave.

191.     Moreover, none of the other students who began the program with Ms. Robinson were required to meet the standards that Ms. Robinson was required to meet in the Venus Gradual Release document presented to her after she returned from her maternity leave.

192.     Those other students who began the program with Ms. Robinson were able to complete the program based on the requirements as set forth in the Gradual Release Calendar that had been provided to all of the students, including Ms. Robinson, in August 2014.

193.     Those students have obtained their teaching license and are now licensed teachers who have been hired as teachers for the 2015/2016 school year and are now earning a full teacher's salary.

194.     As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**FIFTH CLAIM FOR RELIEF**
(Based on Placing Ms. Robinson on the Level III Professional Action Plan)

195.     Robinson incorporates herein all paragraphs alleged above.

196.     Prior to going out on maternity leave Ms. Robinson was not on a Level III Professional Action Plan or any other plan that could lead to the possibility of dismissal from the program.

197.     Putting Ms. Robinson on the Level III Professional Action Plan for the express reason that she was returning from maternity leave as she had stepped out to have her baby violates Title IX as described more fully above.

198.     As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**SIXTH CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on Placing Ms. Robinson at College View
to Perform The Final Phase of Her Internship.)

199.     Robinson incorporates herein all paragraphs alleged above.

200.     Prior to going out on maternity leave Ms. Robinson successfully completed the first eight months of her internship at GVE, earning a grade of "B" in each segment.

201.     At GVE Ms. Robinson was "platooning" to complete the requirements of her internship.  Platooning meant that Ms. Robinson was preparing lesson plans and completing the requirements of the Gradual Release Plan based on a math and science curriculum.  During her lead teach she would teach only these two subject areas and was responsible for lesson plans only associated with these two subject areas.

202.    After Ms. Robinson returned from maternity leave she was placed at College View.  College View did not platoon which meant that Ms. Robinson had to learn a multi-discipline curriculum that she had very little exposure to prior to going on maternity leave.

203.    While Ms. Robinson had eight months in her internship at GVE to learn the math and science curriculum in preparation for her lead teach at GVE, she had only three weeks after the students returned from summer break to learn a completely new curriculum and prepare for her lead teach at College View.

204.    Ms. Robinson's placement at College View after her maternity leave violated Title IX as she was placed in an untenable position of learning a new curriculum and preparing lesson plans in subject matters that she had not been exposed to at GVE.

205.    After her return from maternity leave, Defendant CU, Denver should have ensured that Ms. Robinson return to the same academic status as before her maternity leave.

206.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**SEVENTH CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on the failure to provide Ms. Robinson with the help,
counseling and opportunities to improve her performance.)

207.    Robinson incorporates herein all paragraphs alleged above.

208.    When Defendant CU, Denver placed Ms. Robinson at College View she was required to prepare for her lead teach in multi-discipline curriculum.  Her internship at GVE

encompassed eight months of learning environment in the subject matters that she was platooning in.

209.    Because College View differed substantially from GVE in the expectations of the school leadership and classroom requirements, including the preparation of lesson plans, Ms. Robinson asked for help and additional time in preparing lesson plans and meeting the new requirements she now had to meet at College View that were not required wile at GVE prior to her maternity leave.

210.    Both Gutierrez and Mulcahy voiced their commitment to giving Ms. Robinson extensive coaching and feed back on the lesson plans she prepared that were due on September 18, 2015.  Gutierrez had also scheduled a coaching session for September 19 – 20, 2015 with Ms. Robinson on the lesson plans she prepared for September 18, 2015. Mulcahy also agreed to give Ms. Robinson "in depth" feedback on the final lesson plans submitted on September 18, 2015 as well as her performance in the classroom.

211.    Neither Gutierrez nor Mulcahy ever provided Ms. Robinson with the feedback and coaching promised after she submitted her final lesson plans on September 18, 2015.

212.    Ms. Robinson's lead teach had now been moved back to **after** September, 2015.

213.    Ms. Robinson was not given the same help, counseling, and opportunities to successfully complete her internship after being placed at College View.

214.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional

distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**EIGHTH CLAIM FOR RELIEF - DISCRIMINATION IN VIOLATION OF TITLE IX**
(Based on Dismissal From The Program.)

215.    Robinson incorporates herein all paragraphs alleged above.

216.    CU, Denver's discriminatory conduct in dismissing Ms. Robinson from the program as more fully described above violates Title IX.

217.    Ms. Robinson does not have an alternative pathway to obtain her teacher's license.

218.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**NINTH CLAIM FOR RELIEF**
(Retaliation in Violation of Title IX)

219.    Robinson incorporates herein all paragraphs alleged above.

220.    Ms. Robinson's request for an accommodation that she be allowed to begin her lead teach before going out on maternity leave and her request that she be allowed to begin her lead teach after her maternity leave was protected activity under Title IX.

221.    CU, Denver's act in denying the request, putting her on the Level III Professional Actin Plan, the Venus Gradual Release then dismissing her from the program were retaliatory.

222.	CU, Denver also retaliated against Ms. Robinson after she was dismissed from the program.  In that regard Ms. Robinson requested that the decision be rescinded.  Gutierrez then sent Ms. Robinson a letter stating that she could reenter the program but that she would have to retake an entire semester of her internship and could not continue with the program at the point she was before she went out on maternity leave nor could continue at the point where she was prior to her dismissal.  Such action is retaliatory and a violation of Title IX.

223.	As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

## TENTH CLAIM FOR RELIEF – BREACH OF CONTRACT

224.	Robinson incorporates herein all paragraphs alleged above.

225.	Colorado courts recognize a cause of action for breach of contract by a student against an educational institution where the educational institution makes an academic decision that is "arbitrary, capricious, and made in bad faith" or where the educational institution fails to provide specifically promised educational services.

226.	Ms. Robinson applied for and was accepted into the Graduate Elementary Licensure Program at CU, Denver for the 2014- 2015 school year and began the Student Teacher Residency in the summer of 2014.  The Program is a one year program, which, upon successful completion, Ms. Robinson would have met the requirements to obtain her teaching license.

227.    At all times relevant hereto, Ms. Robinson was a student in academic "good standing" as that terms is defined in CU, Denver's academic policies.

228.    Ms. Robinson paid tuition costs, which CU, Denver accepted and agreed to provide course work and additional requirements, which Ms. Robinson needed in order to obtain a teacher's license and become a licensed teacher in the state of Colorado.

229.    As part of the services CU, Denver agreed to provide, it would allow Ms. Robinson to remain in the program and complete the course requirements so long as she remained in academic good standing.

230.    CU, Denver also promised Ms. Robinson that she would be provided coaching, feedback and support necessary to successfully complete the program requirements.

231.    CU, Denver agreed to provide Ms. Robinson with extensive coaching and feedback extending past September 18, 2015.

232.    Ms. Robinson entered into the program and began an internship at GVE as part of the licensure certification requirements.

233.    CU, Denver breached its agreement with Ms. Robinson when it dismissed her from the program on September 18, 2015 while she was in academic good standing and had not been placed on a Support Plan Protocol for students struggling with the program.

234.    CU, Denver dismissed Ms. Robinson from the program notwithstanding the fact that she was in academic good standing.

235.    Defendant CU, Denver's decision to dismiss Ms. Robinson from the program was arbitrary, capricious, and made in bad faith.

236. As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, any costs of reimbursement of program costs from other sources, damages to her reputation, and emotional distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**ELEVENTH CLAIM FOR RELIEF - DECLARATORY JUDGMENT**

237. Robinson incorporates herein all paragraphs alleged above.

238. CU Denver has committed numerous violations of federal and state law.

239. Ms. Robinson's education and future has been severely compromised and damaged. Without appropriate redress, the unlawful dismissal of Ms. Robinson from the teaching certification program will continue to cause irreversible damages to Ms. Robinson's educational career and future employment prospects, with no end in sight as Ms. Robinson does not have an alternative pathway to obtain her teacher's license.

240. As a result of the foregoing, there exists a justiciable controversy with respect to the permanency of Ms. Robinson's dismissal from the program.

241. By reason of the foregoing and pursuant to 28 U.S.C. § 2201, Ms. Robinson requests a declaration that: (i) the decision to dismiss her from the program be reversed; (ii) an order enjoining the defendant, CU, Denver, to immediately reinstate Ms. Robinson into the Program in order to complete the internship requirement and any other program requirements that she had not completed prior to going on maternity leave. Said internship to be completed at GVE or at a school substantially similar to GVE; (iii) all records related to Ms. Robinson's dismissal from the Program be removed from her

education file and all files maintained by CU, Denver; and (iv) CU's rules, regulations, policies and guidelines be amended to comply with Title IX; and (v) CU provide training to its employees and students on Title IX.

<u>**CAUSES OF ACTION AGAINST INDIVIDUAL DEFENDANTS**</u>

**VIOLATION OF DUE PROCESS – PROPERTY INTEREST**
(Against Wartgow, Kantor, Seidel and Gutierrez, individually)

242.    Robinson incorporates herein all paragraphs alleged above.

243.    The Fourteenth Amendment to the United States Constitution provides that no state may deprive a person of life, liberty, or property without due process of law. Section 25 of Article II of the Colorado Constitution provides similar guarantees and protections.

244.    The 10th Circuit has recognized that students at public universities have a property interest in their place in the program in which they are enrolled that is entitled to due process protection under the Constitution. *Gossett v. State of Oklahoma*, 245 F.3d 1172 (10th Cir. 2001).

245.    Ms. Robinson also had a liberty interest in becoming gainfully employed.

246.    CU, Denver failed to provide Ms. Robinson with notice that she was subject to dismissal from the program for any alleged failure to complete the Level III Professional Action Plan.

247.    The Support Plan Protocol Concerning Teacher Candidate Performance deviated from the University's standards on academic performance by allowing a unilateral decision to dismiss a student from the program even though the student was on academic good standing.

248.    Ms. Robinson was always on academic good standing and was entitled to rely on the University's policies governing academic performance.

249.     The decision to dismiss Ms. Robinson from the program was the result of arbitrary state action and impermissible gender discrimination rather than a careful and deliberate evaluation of Ms. Robinson's academic abilities and willingness to complete the program.

250.     Ms. Robinson's property and liberty interest was infringed upon as she was entitled to receive a hearing – an opportunity to be heard at a meaningful time and in a meaningful manner before she was dismissed from the program.

251.     Ms. Robinson was deprived of a property and liberty interest in her continued enrollment without due process when she was dismissed from the Program without a hearing in violation of the University's academic policies.

252.     All of the individual Defendants had the authority to make policy decisions on behalf of CU, Denver and or the School of Education & Human Development. They also had the authority to establish policies governing student academic standards and policies prohibiting discrimination based on pregnancy, including providing a meaningful pre-termination hearing.

253.     None of the individual defendants are entitled to qualified immunity as they were in a position to provide due process. Ms. Robinson's right to a pre-dismissal hearing in these circumstances was clearly established.

254.     Wartgow was the final policy maker with respect to the suspension and/or termination of university students, including Robinson. Liability is established because Ms. Robinson was deprived of her property and liberty interests without due process.

255.     Acting under color of law, the individual Defendants intentionally violated Ms. Robinson's constitutional rights under 42 U.S.C. § 1983, the Due Process Clause of the

Fourteenth Amendment to the United States Constitution, and Article II of the Colorado Constitution, by purposefully depriving Ms. Robinson of her property and liberty interests when they denied her an opportunity to be heard before dismissing her from the program.

256.     The actions complained of herein were taken in malicious, willful, wanton, reckless indifference to, deliberate indifference to, and/or reckless disregard of Ms. Robinson's rights as guaranteed by 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and Article II of the Colorado Constitution.

257.     As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Ms. Robinson suffered injuries, damages and other losses, including but not limited to lost wages and benefits, tuition costs, damages to her reputation, and emotional distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including, but not limited to:

a.     A declaratory judgment as described above and that all actions complained of herein are unlawful and violate Title IX;

b.     Prospective injunctive relief, prohibiting Defendant CU, Denver from violating Title IX;

c.     An order that Defendants pay all damages Robinson sustained as a result of Defendants' illegal conduct, including but not limited to compensatory damages for lost wages and benefits, tuition costs, damages to her reputation, anxiety, emotional distress, humiliation,

embarrassment, and mental anguish, plus pre- and post-judgment interest at the highest lawful rate and other statutory penalties;

d.      Equitable relief in the form of reinstatement into the program and such other and further legal and equitable relief as this Court deems just and reasonable under the circumstances;

e.      Punitive damages as allowed by law in amount to be determined at trial;

f.      Costs of action incurred herein, including reasonable attorneys' fees and expert fees to the maximum extent available under Federal and State laws; and

g.      Any other relief the Court deems just and appropriate under the circumstances.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY**

Dated this 1st day of October 2015.

_/s Jennifer Robinson_____
Jennifer Robinson, Esq., # 24764
3300 S. Parker Rd., Suite 330
Aurora, CO 80014
Phone: (303) 872-3063
Fax: (303) 766-9237
E-mail: jrobinson@raemployment.com

Attorney for Plaintiff